IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN

| HUGH JEFFREY GILLIAM, | ) | |
|---|---|---|
| Plaintiff, | ) | 3:16-CV-00063-KRG |
| vs. | ) | |
| OFFICER PEARCE, OFFICER KNEPP, OFFICER T. WILLIAMS, OFFICER KIRSCH, OFFICER DIEHL, OFFICER DRISCOLL, OFFICER MCCOLLOUGH, OFFICER ROSENBAUM, OFFICER ZAMEROSKI, OFFICER ARCHER, OFFICER BARTLEY, RN SIMINGTON, RN LONG, DEBORAH ASKEY, RN; AND RN REED, | ) | |
| Defendants, | ) | |

## REPORT AND RECOMMENDATION

Cynthia Reed Eddy, United States Magistrate Judge.

### I. RECOMMENDATION

Presently before the court is the following:

(1) A motion for summary judgment filed by Defendants Officer Pearce, Officer Knepp, Officer T. Williams, Officer Kirsh, Officer Diehl, Officer Driscoll, Officer McCollough, Officer Rosenbaum, Officer Zameroski, Officer Archer, and Officer Bartley (collectively the "corrections defendants") and Defendants RN Simington, RN Long, RN Deborah Askey, and RN Reed (collectively the "medical defendants") [ECF No. 79].

The motion is fully briefed and ripe for disposition. For the reasons that follow, it is respectfully recommended that Defendants' motion for summary judgment be granted.

### II. REPORT

a. Background[1]

---
[1] Plaintiff did not submit a responsive concise statement of material facts, and states in his response to Defendants' motion that he "concedes the facts, but argues that his rights were still violated, according to law." Pl.'s Resp. [ECF No. 86] at 1. Given the leniency afforded to *pro se*

1

The instant civil rights action arises out of the Plaintiff's, Hugh Jeffrey Gilliam ("Plaintiff") confinement to a restraint chair while he was incarcerated at Pennsylvania State Corrections Institution ("SCI") Houtzdale.

### i. August 19, 2015 - August 20, 2015 Restraint Chair Placement

Plaintiff was first placed in a restraint chair on August 19, 2015. On that day, Plaintiff was being housed in a strip cell in the infirmary of SCI Houtzdale as a result of his behavior the previous week when he had broken the Restrictive Housing Unit ("RHU") cell door window and pulled down ceiling tiles. On August 19, 2015 at around 2:00 p.m., Plaintiff started to destroy the infirmary strip cage by pounding on the ceiling portion of the cage until it broke away from the mounting bolts and then bent the cage back until there was a hole large enough to climb out of. Plaintiff's actions were reported to Deputy Superintendent Close who concluded that it was necessary to place Plaintiff in the restraint chair to ensure that Plaintiff did not attempt to access the hold he created in the ceiling and to prevent harm to staff and to prevent Plaintiff from harming himself. According to Deputy Superintendent Close, under Department of Corrections ("DOC") policy, a restraint chair is not used to punish an inmate, but is a form of restraint which may be used under DOC policy to gain control of an inmate. Under DOC policy, the restraint chair can be used to gain control of an inmate after a physical altercation with staff or another inmate, to prevent the destruction of Commonwealth property, and/or when an inmate's behavior presents a danger or threat to himself or others. Deputy Superintendent Close also testified that the DOC was familiar with Plaintiff's destructive behavior which included instances of institutional vandalism, destruction of property, threatening staff and self-mutilation.

---

litigants, the undersigned will take all facts of record into account in making this recommendation and will draw all reasonable inferences in the light most favorable to Plaintiff.

At the shift commander's direction, Lieutenant ("Lt.") Kelley, who was the Zone 1 Lieutenant on duty for the 2:00 p.m. to 10:00 p.m. shift, began assembling a team to place Plaintiff in the restraint chair around 2:51 p.m. The team consisted of Sergeant ("Sgt.") Evans who operated the camera (and is not a party to this action), Corrections Officer ("C.O.") Hall (who is not a party to this action), and Defendants C.O.s McCullough, Rosenbaum, Zameroski, Acher and Bartley. As Lt. Kelley was assembling his team, he received word that Plaintiff was destroying the infirmary strip cage again. Lt. Kelley ordered the team to report immediately to the infirmary and did not conduct an initial briefing. Once the team arrived to the strip cage, Plaintiff stopped damaging the cage and was compliant. There was visible damage to the strip cage upon the team's arrival. Lt. Kelley read Plaintiff a notice regarding his restraint chair placement and staff then removed him from the strip cage and placed him into the restraint chair. As officers placed restraints on Plaintiff's wrists, Plaintiff indicates to the officers that they should get two fingers worth of looseness in the strap and that his hand is already turning red. Plaintiff also indicates that if they do not loosen the straps, he will initiate a lawsuit. Lt. Kelley had staff check the straps again and Lt. Kelley also checked Plaintiff's fingers and hands and Registered Nurse ("RN") Simington made his medical assessment by checking the straps and capillary refill. RN Simington found no depression on the flesh, good capillary refill and good pedal pulses. Plaintiff contends that it is only a mere seconds after his hands and feet are secured that nurses check the straps for pedal pulses and capillary refill and argues that this is not enough time to check for such things because it takes more time than just mere seconds to determine if the oxygen in the blood is getting to his extremities. He also alleges that he complained several times that the straps were too tight.

After Plaintiff was secured and assessed by RN Simington, Plaintiff was moved to another cell and the team left. Sgt. Evans remained at the door with the video camera for several minutes

after the team left and the video shows Plaintiffs straining against the straps and jerking his body back and forth. According to Lt. Kelley's chronology, at around 4:35 p.m., the infirmary officer reported that Plaintiff was attempting self-harm by striking the bunk with his left knee. Lt. Kelley returned with his team to reposition the chair to eliminate the opportunity for Plaintiff to harm himself and to have RN Simington check Plaintiff. RN Simington checked the should strap and Lt. Kelley loosened it slightly. After the team left, a surveillance video shows that Plaintiff is trying to bite the shoulder strap at about 4:55 p.m. Plaintiff alleges that he did not attempt to bite the strap, but that he turned his head side to side to relieve pressure and extreme pain on his neck and arm pit areas.

Plaintiff was given exercise periods and medical checks every two hours, at approximately 5:00 p.m., 6:53 p.m. and 9:00 p.m. in accordance with DOC policy which requires exercise and medical checks at approximately two hour intervals. At around 5:00 p.m., Plaintiff accepted his evening meal and exercised his upper extremities. Each wrist strap was loosened and he could exercise his arm, but he refused to exercise his lower extremities. At 5:04 p.m., Lt. Kelley and the officer adjusted the shoulder strap and RN Simington assessed Plaintiff finding that he had brisk capillary refill in his upper extremities and positive pedal pulses. These same procedures were followed in the subsequent exercise periods at 6:53 p.m. and 9:00 p.m. and RN Simington assessed Plaintiff each time and found brisk capillary refill and good pedal pulses. During the second exercise period, around 6:53 p.m., Lt. Kelley spoke with Plaintiff trying to explain to Plaintiff that trying to move the chair and thrashing back and forth will cause Plaintiff abrasions from where the shoulder straps contact the skin. At the 9:00 p.m. exercise period, the shoulder straps were readjusted to remove the straps from hot spots.

Plaintiff developed superficial abrasions which were documented in the medical record and

photographed and Defendants attribute these abrasions to Plaintiff's resistance and struggling against the chair. Plaintiff asserts that "any human being[] who is placed in a 5 point restraint chair, naked, with the straps placed extremely tight, and causing pain to them, is NOT gonna [sic] still, or keep quiet, but do everything he can think of or possibly do, to either relieve the pain, or attempt to have someone relieve it, whether its[sic] moving around to try to lessen the pain on one side at a time, or yell to get someone[']s attention that it [is] hurting, or just to have human comfort, or just the presence of another person. This is the reason plaintiff was moving around, etc. Plaintiff was enduring extreme unbearable pain from the straps, and even in one exercise video, crying because the pain was so bad, begging to be released." Pl.'s Resp. [ECF No. 86] at 4.

Captain Michael Baker arrived for the 10:00 p.m. to 6:00 a.m. shift on August 19, 2015 and the prior shift commander advised Captain Baker that Plaintiff was due to be removed from the restraint chair at around 11:00 p.m., but that the Superintendent had authorized an extension of time in the chair beyond the eight-hour maximum depending on Plaintiff's behavior. Under DOC policy, there is an eight-hour maximum placement of an inmate in a restraint chair and an inmate is removed from a restraint chair after that eight-hour period unless his behavior warrants additional time, which must be approved by the Superintendent or his designee. As Captain Baker assembled the removal team around 10:30 p.m., Plaintiff could be heard yelling loudly from his cell. At that point, Captain Baker determined that Plaintiff's behavior did not warrant removal and instead had the team conduct an exercise period at approximately 10:40 p.m. At this exercise period, RN Long, who took over for Simington at 10:00 p.m., performed a medical assessment of Plaintiff and the staff re-secured the straps and left the cell around 11:00 p.m. About an hour and a half later, at 12:30 a.m. on August 20, 2015, Plaintiff was removed from the chair. Once Plaintiff was removed, he was strip searched and assessed by RN Long at about 12:51 a.m. and RN Long

found that Plaintiff had good circulation, there were no open areas or bleeding and he was able to walk back to the medical POC cell. All in all, Plaintiff was placed in the restraint chair for approximately nine hours from August 19, 2015 through August 20, 2015.

*ii. September 8, 2015 Restraint Chair Placement*

On about September 4, 2015, Plaintiff was transferred from the RHU to a psychiatric observation cell because he had threatened to harm himself again and was monitored medically for the next few days. On September 7, 2015, Plaintiff threatened to destroy something "every day until I leave" and later in the day tore large pieces of plastic from his bed and was found to have tampered with his cell. At that point, Plaintiff had been placed in an intermediate restraint system for damaging his psychiatric observation cell and moved Plaintiff to the RHU. An intermediate restraint system is a form of restraint that involves handcuffing the inmate in the front and attaching the handcuffs to a belt or band that is fastened around his waist and is used to limit the inmate's ability to use his hands for things other than eating, drinking, etc. At about 11:53 p.m. that night, Captain Baker was notified that Plaintiff had broken the intermediate restraint system. Captain Baker went to the housing unit and viewed the damage to the intermediate restraint system, and found that Plaintiff had maneuvered himself against the wall and rubbed the belt until he was able to break the strap or loop with the D ring, which keeps his handcuffs attached to his waist and restricts movement. This allowed Plaintiff to get his arms and hands free and start damaging the cell. After Plaintiff broke the restraints, he damaged and ingested part of his mattress and swallowed a spherical metal object. Plaintiff was also threatening to continue damaging the property.

Deputy Close authorized restraint chair placement, as he and Captain Baker believed it was necessary to get Plaintiff under control and to prevent further harm to property and to prevent

Plaintiff from further harming himself. Captain Baker instructed Lt. Malinich (not a named defendant in this case) to assemble a team to conduct the chair placement and exercise periods. The team, who were specially trained in restraint chair placement, consisted of Defendants C.O.s Pearce, Diehl, Knepp, Williams, Driscoll and Kirsch. Plaintiff was removed from his cell and taken to a strip cage where the officers had to cut off the damaged intermediate restraint system belt. Plaintiff also told the officers what he swallowed, which included a ball bearing, rubber caulking and mattress filling. Plaintiff had red markings and abrasions on his waist and wrists from trying to remove himself from the intermediate restraint system, which RN Reed photographed before Plaintiff was placed in the restraint chair. Plaintiff was placed in the restraint chair around 1:45 a.m. on September 8, 2015. Plaintiff commented that the straps were too tight, and RN Reed checked him and confirmed that his circulation was acceptable.

The team then moved Plaintiff back into his cell in the unit and Plaintiff repeatedly shouted "I'm back!" Once he was placed in the cell and the door closed, the camera operated remained and continued filming for several minutes. During this time, Plaintiff can be seen struggling to get out of the chair, banging his head repeatedly and biting at the shoulder straps and jerking or rocking the chair back and forth.

Plaintiff was given exercise periods every two hours, at roughly 4:00 a.m., 5:45 a.m. and 7:30 a.m. At each exercise period, Plaintiff received medical assessment and was under constant video surveillance by medical staff and the shift officer. RN Reed examined Plaintiff at each exercise period until the 6:00 a.m. shift arrived and found no circulation or other medical problems. At the 4:00 a.m. exercise period, Plaintiff complained that his wrists hurt and complained that the straps were too tight. RN Reed performed neuro and motion checks and noted that Plaintiff's O2 saturation levels were about 98% on both hands. RN Reed noted red marks on all contact points

due to Plaintiff pulling at the restraints, but found no open wounds and Plaintiff voiced no concerns from swallowing foreign bodies. At the 5:50 a.m. exercise period, Plaintiff against stated that the straps were tight and RN Reed noted abrasions to all contact points but circulation and neuro checks were normal. RN Reed attributed the abrasions to Plaintiff placing resistance to the straps and indicated that no treatment was needed. At the 7:30 a.m. exercise period, Lt. Grove found that Plaintiff had worked his feet free. Plaintiff was re-secured and checked by RN Askey, who took over for RN Reed and worked the 6 a.m. to 2 p.m. shift. RN Askey noted that Plaintiff was complaining that his shoulders hurt and that he had red marks at his armpits; but he was able to exercise all of his extremities and RN Askey was able to place her hand under the shoulder straps on both sides. RN Askey also noted that Plaintiff had rapid capillary refill and no medical issues. Plaintiff ate breakfast at this exercise period.

Plaintiff was removed from the chair around 8:55 a.m., just over seven hours after placement and RN Lukehart (not a party to this action) took photos. Once removed, Plaintiff told RN Lukehart about the marks by his shoulders and neck and told RN Lukehart that he consumed a ball bearing, some mattress and other things the previous night. RN Lukehart's assessment of Plaintiff's neuro and respiratory systems was normal and he noted three-inch reddened areas to both of Plaintiff's armpits and an approximately two-inch reddened area to the right side of Plaintiff's neck. RN Lukehart noted no other apparent injuries and Plaintiff denied having any other injuries.

Plaintiff did not seek any medical attention following either restraint chair placement, although he was seen by medical almost daily from August 21, 2015 through September 7, 2015. On September 10, 2015, Plaintiff had x-rays completed showing two foreign bodies in his abdominal area, and was scheduled to have a follow-up x-ray taken on September 15, 2015.

8

Plaintiff could not be transported for a follow-up x-ray because he had covered himself in feces.

Plaintiff initiated the present action, proceeding *pro se*, on March 7, 2016, and later submitted an Amended Complaint on August 26, 2016 [ECF No. 19] complaining that the amount of time he spent in the restraint chair on August 19, 2015 and September 8, 2015 was excessive and that the restraint chair straps were too tight and caused him injury. While Plaintiff does not specifically set forth the causes of action in his amended complaint, due to the leniency afforded to *pro se* individuals, the court will construe Plaintiff's amended complaint as asserting a violation of his Eighth Amendment right against cruel and unusual punishment.

    b. Standard of Review

        *i. Pro Se Litigants*

*Pro se* pleadings are held to a less stringent standard than more formal pleadings drafted by lawyers. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). As such, a *pro se* complaint pursuant to 42 U.S.C. § 1983 must be construed liberally, *Hunterson v. DiSabato*, 308 F.3d 236, 243 (3d Cir. 2002), so "as to do substantial justice." *Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004) (citations omitted). In other words, if the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir.1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"). Notwithstanding this liberality, *pro se* litigants are not relieved of their obligation to allege sufficient facts to support a cognizable legal claim. *See e.g., Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). Because Plaintiff is a *pro se* litigant, this Court may

9

consider facts and make inferences where it is appropriate. While Plaintiff does not specifically enumerate his claims, the court will make the inference that he seeks to bring a 42 U.S.C. § 1983 claim against the Defendants for violating his Eighth Amendment rights pursuant to the federal constitution in connection with his placement in the restraint chair in August and September 2015.

### ii. *Federal Rule of Civil Procedure 56(a)*

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metropolitan Live Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e. depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322. *See also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 F. App'x 211, 213 (3d Cir. 2010) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)).

10

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Batsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

    c. <u>Discussion</u>

        i. *42 U.S.C. § 1983*

Plaintiff's Eighth Amendment claim is made pursuant to 42 U.S.C. § 1983 ("section 1983") which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

To state a claim under section 1983, a plaintiff is required to show that an individual acting under color of state law violated the plaintiff's constitutional rights or statutory rights. *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

In order for a plaintiff to adequately state a claim under section 1983, he must establish that the defendant deprived him of a right secured by the United States Constitution acting under color of state law. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). A plaintiff

11

alleging a constitutional violation "must portray specific conduct by [ ] officials which violates some constitutional right." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015). By doing so, a plaintiff must demonstrate a defendant's "personal involvement" in the alleged constitutional violation by adequately alleging either (1) the defendant's personal involvement in the alleged violation; or (2) his actual knowledge and acquiescence in the wrongful conduct. *Id*. (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." Id. (citations omitted).

### ii. *Excessive Force in violation of the Eighth Amendment*

Plaintiff alleges that his constitutional rights were violated in two ways by his placement in the restraint chair: (1) the straps were placed too tight; and (2) the time that he spent in the chair was excessive. To be clear, Plaintiff does not complain that the decision to place him in the chair violated his constitutional rights.

The Defendants move for summary judgment asserting that the undisputed facts do not establish excessive force in violation of the Eighth Amendment in connection with Plaintiff's placement in the restraint chair on August 19, 2015 and September 8, 2015. As Plaintiff asserts an Eighth Amendment claim against the corrections officers and medical staff who were involved in his placement in the restraint chair in August and September 2015, and because the standards in determining such a claim against corrections officers and medical staff are inherently different, each set of defendants will be addressed separately.

**Corrections Officers**

First, there is no set of facts from which a reasonable jury could find that the corrections

defendants violated Plaintiff's Eighth Amendment rights against cruel and unusual punishment in connection with his placement in the restraint chair in August or September 2015.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. The United States Supreme Court "has interpreted this prohibition to bar prison officials from using excessive force against inmates, . . . and to impose affirmative duties on prison officials to 'provide humane conditions of confinement.'" *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015) (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) and *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). In determining whether a prisoner's Eighth Amendment right against excessive force has been violated, the court must determine whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Not every "malevolent touch by a prison guard gives rise to a federal cause of action[,]" *Hudson*, at 9, and only an "[a]pplication of force by prison guards exceeding that which is reasonable and necessary under the circumstances may be actionable." *Young*, 801 at 180 (internal quotation marks and citations omitted). In determining whether a corrections officer has used excessive force in violation of the Eighth Amendment, the court should view several factors in making this determination: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)) (internal quotation marks omitted).

Again, Plaintiff's sole complaint as to the corrections officers' use of excessive force is that the straps were pulled too tight when he was placed in the restraint chair and that he remained

in the restraint chair for an excessive amount of time. For the reasons that follow, there is no evidence of record that the force that was applied to Plaintiff was excessive and the corrections defendants should be entitled to summary judgment in their favor.

As for Plaintiff's contention that the straps should have been secured in such a manner to fit two fingers between Plaintiff and the strap is unsupported by any factual evidence, other than his own opinion as to how tight the straps should have been secured. Indeed, some physical discomfort "is to be expected from confinement in a restraint chair." *Knight v. Walton*, 2015 WL 9243902, at *5 (W.D.Pa., Sept. 24, 2015). It is axiomatic that the use of force in strapping Plaintiff in the restraint chair was not excessive. The need for the corrections officers to apply force in both the August and September 2015 incidents was patent. In August 2015, Plaintiff was actively damaging the infirmary strip cage in such a way that Plaintiff created a hole that was large enough to climb out of. In September 2015, Plaintiff had broken out of the intermediate restraint system and again began damaging his cell and ingesting multiple foreign objects including, *inter alia*, portions of his torn mattress and a ball bearing. On both occasions, Plaintiff was a danger to others and to himself which required the corrections defendants to apply force and the amount of force applied was commensurate with Plaintiff's violent outbursts and self-harm. While Plaintiff claims that the straps were too tight, he does not point to any serious injuries that he suffered due to the tightness of the straps. Plaintiff testified that on both occasions he suffered only superficial injuries from the straps that completely resolved after a week, he was able to stand and walk after being removed from the restraint chair, and he did not sign up for sick call or otherwise seek medical attention for his injuries. Accordingly, it is respectfully recommended that the corrections defendants' motion for summary judgment be granted in this respect.

As for the amount of time that Plaintiff spent in the restraint chair, it is undisputed that

DOC policy was followed on both occasions that Plaintiff was placed in the restraint chair. During the September 2015 instance, Plaintiff was kept in the restraint chair for just over seven hours. As shown in the video, during that period, he manipulated the restraints in such a way that caused him injury. During the August 2015 episode, Plaintiff was kept in the restraint chair an additional 1.5 hours over the maximum, which was approved due to Plaintiff's combative behavior. DOC policy mandates that an inmate only be kept in the restraint chair for a maximum of eight hours without prior approval. It is undisputed that DOC policy was followed in determining how long Plaintiff remained in the restraint chair on both occasions and that during his time in the restraint chair, on both occasions, in accordance with DOC policy, Plaintiff was given an exercise period and medical attention every two hours and received regular meals. Under these circumstances, a reasonable jury could not find that the defendants used force "maliciously and sadistically for the very purpose of causing harm." *Young*, 801 F.3d at 180 (citations omitted). *See Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000) (placement inmate in restraint chair for eight hours when inmate received an exercise period every two hours, was given food and examined by a nurse at the end of the confinement did not constitute cruel and unusual punishment under the Eighth Amendment); *Abdullah v. Seba*, 658 Fed.Appx. 83, 85 (3d Cir. 2016) (inmate kept in restraints for 24 hours was not an Eighth Amendment violation as the inmate "continued to be disruptive and stated he would not be compliant if he was released); *Mohamad v. Barone*, 494 Fed.Appx. 212 (3d Cir. 2012) (inmate kept in restraint chair for 24 hours did not constitute cruel and unusual punishment in violation of the Eighth Amendment).

There is simply no record evidence to support Plaintiff's claim that his Eighth Amendment rights were violated by the corrections defendants in their conduct of pulling the straps too tight or leaving Plaintiff in the restraint chair for too long. No reasonable jury could find that the

15

corrections defendants used malicious and sadistic force for the purpose of causing Plaintiff pain or harm. *See e.g., Mohamad v. Barone*, 494 Fed.Appx. 212, 214 (3d Cir. 2012). As such, it is respectfully recommended that the corrections defendants' motion for summary judgment be granted.

### Medical Staff

As for the medical defendants, there is no evidence of record that they were deliberately indifferent to Plaintiff's serious medical needs in connection with his placement in the restraint chair in August and September 2015.

In accordance with the Eighth Amendment's prohibition against cruel and unusual punishment, the government is obliged "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Id.* at 104 (citation omitted). Such indifference to a serious medical need can be shown by:

> an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

*Neiswonger v. Montgomery*, 2016 WL 7375032, at *3 (W.D. Pa. Dec. 20, 2016) (emphasis added). *See also Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) ("Deliberate indifference may be shown by intentionally denying or delaying medical care."); *Foye v. Wexford Health Sources Inc.*, 675 Fed.Appx. 210, 215 (3d Cir. 2017) ("Deliberate indifference" may be inferred when a prison official knows of a prisoner's need for medical treatment but intentionally fails to provide it; delays necessary medical treatment for a non-medical reason; or prevents a prisoner from receiving

medical treatment that was needed or recommended.").

"[W]hether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed ... deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05 (citations omitted). A medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id*. The "deliberate indifference" a plaintiff must show through a complaint's factual allegations lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other," *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994), and is frequently equated with recklessness as that term is defined in criminal law. *Id*. This standard, however, "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

Where a prisoner has received medical care and the adequacy of the treatment is challenged, courts are often reluctant to second guess professional medical judgment. *Id*. An inmate's disagreement with the diagnosis or course of treatment does not suffice to establish "deliberate indifference" under the Eighth Amendment. *Estelle*, 429 U.S. at 106. Mere misdiagnosis or "medical malpractice cannot give rise to a violation of the Eighth Amendment," *White v. Napoleon*, 897 F.2d 103, 106 (3d Cir. 1990). *See also Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (mere negligence does not constitute deliberate indifference), because negligent treatment

17

is not actionable as cruel and unusual punishment prohibited by the Eighth Amendment. The Supreme Court in *Estelle v. Gamble* explained:

> in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

429 U.S. at 105–06.

As an initial matter, there is no record evidence that would allow a reasonable jury to conclude that Plaintiff was suffering from a serious medical need. "A medical need is serious where it 'has been diagnosed by a physician as requiring treatment' or is 'so obvious that a lay person would easily recognize the necessity' of medical attention." *Palakovic v. Wetzel*, 854 F.3d 209, 227 n. 23 (3d Cir. 2017) (quoting *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). This element "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Moreno-Vigo v. Berkihiser*, 2016 WL 374451, at *9 (M.D.Pa. Feb. 1, 2016) (citations omitted). Here, it is undisputed that Plaintiff's medical needs included superficial abrasions to his wrists, ankles and chest from the straps on the restraint chair. These abrasions healed within a week and required no treatment. No reasonable jury could find that superficial abrasions of the type Plaintiff sustained are a "serious medical need" that would give rise to a constitutional violation. *See Moreno-Vigo v. Berkihiser*, 2016 WL 374451, at *9 (minor abrasions to the scalp and knees did not constitute a serious medical need for Eighth Amendment purposes); *Wisneski v. Denning*, 2014 WL 1758118, at *22 (W.D.Pa. Apr. 30, 2014) (scrapes, bruising and scratches do not constitute a serious medical need for Eighth

Amendment purposes) (collecting cases).

Setting aside whether Plaintiff has adduced adequate evidence to support a "serious medical need," it is undisputed that Plaintiff received medical treatment at each of the exercise periods while he was confined to the restraint chair. Where an inmate receives "meticulous care and attention" from medical staff while in restraints, it "belies any claim of deliberate indifference to his physical needs." *Crawford v. White*, 2015 WL 3753930, at *14 (M.D.Pa. June 16, 2015). Plaintiff simply disagrees with the course of treatment he received by arguing that the nurses should have waited longer to check his circulation after the straps were secured, and they failed to loosen the straps after he complained that they were too tight. Such conduct does not give rise to the level of a constitutional violation.

Accordingly, as there is no evidence of record that supports a claim for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, it is respectfully recommended that the medical defendants' motion for summary judgment be granted.

    d. Conclusion

Based on the foregoing, it is respectfully recommended that Defendants' motion for summary judgment [ECF No. 79] be granted.

Any party is permitted to file Objections to this Report and Recommendation to the assigned United States District Judge. In accordance with 28 U.S.C. § 636(b), Fed. R. Civ. P. 6(d) and 72(b)(2), and LCvR 72.D.2, Plaintiff, because he is a non-electronically registered party, may file objections to this Report and Recommendation by **October 13, 2017** and Defendants, because they are electronically registered parties, may file objections by **October 10, 2017**. The parties are cautioned that failure to file Objections within this timeframe "will waive the right to appeal." *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).

Dated: September 26, 2017.                                    Respectfully submitted,
                                                              s/ Cynthia Reed Eddy
                                                              Cynthia Reed Eddy
                                                              United States Magistrate Judge


cc:     Honorable Kim R. Gibson
        United States District Judge
        *via electronic filing*

        HUGH JEFFREY GILLIAM
        LR-4723
        SCI Houtzdale
        P.O. Box 1000
        Houtzdale, PA 16698-1000

        *Counsel of record via CM/ECF electronic filing*